MARY M. LANE, Appellee, v. INTER-URBAN RAILWAY COMPANY, Appellant.

RAILROADS: "Construction and Operation" Defined—Private Spur
1   Track. The construction by an interurban electric railway company
    of a spur track from its main line and across a public street, and
    to the private property of another, and the operation of cars there-
    over, constitute the *"construction and operation"* of a railway,
    within Sec. 2054, Code, 1897, which requires the construction by
    such company of safe crossings; and this is true even though the
    cost of construction and maintenance (except electrical equipment)
    of all that part of the tract in the street is borne by the said private
    party.

NEGLIGENCE: Contributory Negligence—Excusing Factors. The fact
2   that an injured person was wholly unacquainted with the walk on
    which he was injured, and had his mind momentarily diverted by
    the car which he was intending to enter, may be sufficient to save
    him from the imputation of negligence *per se* in stumbling into a
    depression in the crossing.

TRIAL: Instructions—Ambiguous Modification. An ambiguous modifi-
3   cation of a requested instruction may, when the instructions are
    viewed as a whole, demonstrate that the complainant suffered no
    prejudice.

RAILROADS: Negligence—Tracks Across Sidewalks. It is not error
4   for the court to instruct, in substance, that a railway company, in
    laying its track across an existing brick sidewalk, was under duty
    to so construct the crossing that the completed work would be
    practically on a level with the adjacent sidewalk.

*Appeal from Polk District Court.*—CHARLES A. DUDLEY, Judge.

JANUARY 14, 1921.

ACTION at law to recover damages for personal injury. Trial
to jury. Verdict and judgment for plaintiff, and defendant
appeals.—*Affirmed.*

*W. H. McHenry* and *A. B. Howland,* for appellant.

*Thomas A. Cheshire* and *H. H. Griffiths,* for appellee.

Weaver, J.—College Avenue, in the city of Des Moines, extends east and west. On the north side of this avenue, between Main Street and Bluff Street, which extend north and south, a

1. Railroads: "construction and operation" defined: private spur track.

brick sidewalk has been constructed by or under authority of the city, and is open to public and common use. The defendant, Inter-Urban Railway Company, owns and operates a line of railway in said city, in the vicinity of the intersection of College Avenue and Main Street. It has also, as is alleged, constructed and operates a spur track, beginning a short distance north of College Avenue and west of Main Street, and extending in a southwesterly curve across the avenue to a coal yard or station on property owned by one Snider. The facts and circumstances attending the construction and operation of the spur will be more particularly mentioned later. Plaintiff alleges as her cause of action that, on the 9th day of August, 1916, she, with others, was walking east on the sidewalk mentioned, to reach the station of the street railway, and walking somewhat hurriedly, but with reasonable care, to reach and board a street car which was approaching the corner. In so doing, she stepped into a hole or depression existing in the walk between the rails of the spur track, whereby she was thrown off her balance, causing her to stumble forward, catch her foot on the east rail of the spur, and fall to the sidewalk with great force and violence. In falling, she threw out her hands to save herself, with the result that, in striking the walk, both bones in each of her wrists were broken, and the adjacent muscles and ligaments bruised and lacerated. In addition to these injuries, she suffered other very serious bruises and wounds, all together serving to cause her physical and nervous shock, and to be put to great expense for the services of physicians and nurses, as well as loss of time and earning capacity, for all of which she asks a recovery of damages.

She charges that this accident and her injuries were thus occasioned by negligence of the defendant company in failing to construct, keep, and maintain the crossing of the spur track over the sidewalk in reasonably safe condition for travel by persons lawfully using the public way; that the space between the rails where they cross said walk was negligently left and permitted to remain unfilled, several inches below the level

of the walk outside of the rails, thus creating a trap or source of danger to pedestrians making use of the way.

The defendant denies all charges of negligence, and alleges that plaintiff's own negligence is the proximate cause of her injury. It specially denies that it owns the spur track, or is under any obligation or duty to keep or maintain the walk or crossing in repair.

As will be seen from the foregoing statement, this action presents two principal issues, which counsel have discussed in the following order:

1. The alleged liability of the defendant for the proper and safe maintenance of the crossing of the spur track over the sidewalk; and

2. If such liability be found, the sufficiency of the evidence to sustain a finding of the negligence alleged.

I. Taking up the first question, the testimony shows, without dispute, that, in October, 1912, one F. P. Snider, desirous of conducting a retail and distributing coal station on a certain tract of land owned by him, lying immediately south of College Avenue and west of Main Street, applied to the defendant to secure connection between the railway and his proposed coal yard or station by spur track. This negotiation resulted in the execution of a written contract, which we here set out in full.

"Whereas, Mr. F. P. Snider, present address No. 1318 Norton Avenue, Des Moines, Iowa, has appeared before the Inter-Urban Railway Company and stated that he has purchased and is the owner of Lots One (1) and Two (2), Block One (1), Central Place Addition to the city of Des Moines, Iowa, also that it is his purpose to operate a coal depot on said premises for retailing and distributing coal to his customers; and has requested the Inter-Urban Railway Company to furnish railroad facilities to said premises; and

"Whereas, the Inter-Urban Railway Company, a corporation organized under the laws of the state of Iowa, with its principal place of business in the city of Des Moines in the said state (hereinafter for convenience designated as the Inter-Urban Company), in order to comply with the request of the said Snider, proposes to construct and operate a track from a connection with the main line of the Belt Line division of the Des Moines

City Railway Company at a point about one hundred and fifty feet north of the north line of State Street (also known as College Avenue) in the city of Des Moines to the coal depot of the said Snider located as hereinbefore described, said track to be located substantially as shown in yellow upon the attached blⱴ print marked 'Exhibit A.'

"Now therefore, this writing executed on this 3d day of October A. D. 1912, by and between the Inter-Urban Railway Company and F. P. Snider will witness that the contract under which said track above referred to is to be constructed, maintained, and operated is as follows:

"First: The right of way for the construction of said track, other than that owned by the Des Moines City Railway Company, shall be provided by said Snider, and the said Snider shall protect the Inter-Urban Company against any loss on account of any objections on the part of the owners of such property to the construction and maintenance of said track.

"Second: The Inter-Urban Company shall bear the cost of construction and maintenance of that portion of said track and electrical equipment as will lie north of the aforesaid north line of State Street (the said north line of State Street being also the right of way line of the Des Moines City Railway Company) and the said Snider shall bear the cost of construction and maintenance of that portion of said track as will lie south of the said north line of State Street excepting only the cost of construction and maintenance of the electrical equipment, the cost of constructing and maintaining such electrical equipment to be borne by the Inter-Urban Company. The portion of said track and electrical equipment to be paid for by each party hereto will remain the property of the respective parties hereto, their successors or assigns.

"Third: To secure his obligation to pay his portion of the cost of construction of said track, the said Snider shall deposit with the Inter-Urban Company, prior to the beginning of such construction, the sum of three hundred and ten dollars ($310.00), which is the estimated cost of the portion of said track to be paid by the said Snider. Within thirty days after the completion of said track the Inter-Urban Company shall prepare a statement showing the actual amounts expended by it for the

construction of that portion of the said track to be paid for by the said Snider, including grading, labor, and material for track construction and all expenses incurred by the Inter-Urban Company in connection with the construction of the said Snider's portion of said track, plus ten per cent of the aggregate of the foregoing items to cover overhead charges. If the cost to be borne by the said Snider, as shown on said statement exceeds the sum deposited as aforesaid, such excess shall be paid by the said Snider to the Inter-Urban Company upon demand, but if such cost should be less than said sum, the Inter-Urban Company shall immediately account to the said Snider for the remainder of such sum deposited as aforesaid.

"Fourth: The said Snider, in further consideration of the construction and operation of the said track, releases the Inter-Urban Company from all liability on account of the construction, maintenance and operation of said track, and agrees to indemnify and to save harmless the Inter-Urban Company from all liabilities to others on account of any damage to person or property caused by or growing out of the construction of the said track and the operation of cars and engines over the same by the Inter-Urban Company.

"Fifth: If the said Snider, his successors or assigns, should cease to maintain and operate a coal depot at the location specified hereinbefore for a period of eighteen consecutive months, then the Inter-Urban Company may consider said coal depot abandoned and may if it so desires, remove all property including track, poles, wires, and all other material and property belonging to the Inter-Urban Company, as specified hereinbefore, without any liability of any nature whatsoever to the said Snider, his successors or assigns.

"Executed in duplicate on the date first above written.

"Inter-Urban Company,

"By (SGD) C. F. Hewitt, Vice-President.

"Attest:....................................

"Secretary.

"(SGD) F. P. Snider."

That contract, so far as the record of the case reveals, is still in full force. Acting under it, the defendant did construct the spur in October, 1912, and extended its own electrical equip-

ment over it, for the purpose of handling, hauling, and moving cars of coal consigned to the Snider yard, and for the removal of cars therefrom when unloaded. The spur track and power have also, from time to time, been used by the defendant, with Snider's consent, for the handling and delivery of other freights to other consignees. Indeed, during all the years of its existence, no other company or person than the defendant has ever hauled or moved any cars or trains over or upon the spur, nor has any other motive power than defendant's ever been used in its operation.

It is argued for the appellant, however, that, in view of the quoted contract and admitted facts, defendant cannot be said to have "operated" the track, within the contemplation of the statute, and is, therefore, not charged with the statutory duty to maintain the sidewalk crossing in repair.

The statutes having material bearing on this controversy may be stated as follows: Code Section 2054 provides that every corporation "constructing or operating" a railway shall "construct at all points where such railway crosses any public road good, sufficient and safe crossings," and further provides that any company "neglecting or refusing to comply with the provisions of this section shall be liable for all damages sustained by reason of such refusal or neglect, and it shall only be necessary, in order to recover, for the injured party to prove such neglect or refusal."

By Code Section 2039, all duties and liabilities imposed by law upon corporations owning or operating railways are made applicable to all lessees "or other persons owning or operating such railways as fully as if they were expressly named therein, and any action which might be brought or penalty enforced against any such corporation by virtue of any provisions of law may be brought or enforced against such lessees or other persons;" and, by Section 2033-b, Code Supplement, 1913, the words "railway, railway company, railway corporation, railroad, railroad company, and railroad corporation, as used in the Code and Acts of the General Assembly, now in force or hereafter enacted, are hereby declared to apply to and include all interurban railways, and all companies or corporations constructing, owning or operating such interurban street railways, and all provisions

of the Code and Acts of the General Assembly, now in force or hereafter enacted, affecting railways, railway companies, railway corporations, railroads, railroad companies and railroad corporations, are hereby declared to affect and apply in full force and effect to all interurban railways, and to all interurban railway companies or railway corporations constructing, owning or operating such interurban railways.''

The language of the statute is not at all ambiguous.  Here is a line of railroad, short though it be, constructed across a city street and sidewalk.  The duty to make that crossing reasonably safe and sufficient is, as we have seen, cast upon the party or parties ''constructing or operating'' the railway.  The defendant admits that it constructed this railway, under a written contract by which it bound itself in specific terms ''to construct and operate'' a track from a given point north of College Avenue to the Snider coal depot, which line necessarily crossed the avenue and sidewalk; that, by the same contract, such track was to be ''constructed, maintained and operated'' by the defendant, upon conditions to be performed by Snider; that it did, in fact, construct said railway, extended its own electrical equipment over it, and by the use of its said motive power and equipment, has hauled every car of freight and every empty car which has ever been moved or transported over that track during all the nine years since the switch was constructed: yet it is earnestly argued that, in so doing, the company is not ''operating'' the spur.  But if this be not ''operating'' the switch, what is it?  How is any railway or track operated, except by using it as a way on and over which the movement and transportation of cars and freight are accomplished or carried on?  That is the use to which this switch has been put from the day it was brought into being by defendant and Snider down through all its history.  There is no evidence or slightest indication that any other party or person has made the slightest use of it.  That this is operation of the track, within the meaning of the statute, is not open to reasonable question.

Counsel premise their discussion at this point by admonishing the court that this is a case in which ''the rule of strict construction must be applied.''  But why?  And if so, how will the rule of strict construction operate to relieve the defendant

from any liability which may rest upon it by the unambiguous words of the statute and of the contract, when construed in strict accord with the ordinary usage of the language by English-speaking people? The reference by counsel to Code Section 2039, relating to the duties and liabilities of "lessees or other persons owning or operating such railways," and the suggestion that, under the rule *ejusdem generis*, the words "other persons" must be held to mean others of like kind or character, and that these words cannot include defendant, because it is neither owner nor lessee, do not get us very far. The defendant is not sought to be charged as lessee, and, for the purposes of the case, it may be conceded that it is not a lessee. Whether it may not be an owner, within the meaning of the law, is not so apparent.

By its contract with Snider, defendant undertook to construct, at its own expense, all that part of the spur lying north of the avenue, and, at its own cost, to furnish and maintain the electrical equipment for the entire line. By the same contract, Snider agreed to bear the cost of construction and maintenance of that part of the track south of the north line of the avenue, and to pay defendant in advance "his portion" of the cost of constructing the track, estimated at $310. They further agreed, as we have seen, that the portion of "the track and electrical equipment to be paid for by each party will remain the property of the respective parties, their successors and assigns." It was finally stipulated that, if the coal station should ever be abandoned, then the defendant could rightfully retake all its property, including the track, poles, wire, and other material belonging to it. By reference to the plat of the premises found in the record, it appears that that part of the spur north of the avenue furnished by the defendant at its own expense is 150 feet in length, while that part constructed south of that line is 190 feet. Of this 190 feet, the length of 50 feet is in the street crossing, leaving only 140 feet on the Snider tract. Thus it will be seen that there was a fairly even division between the parties of the cost of constructing the spur, including the contribution of motive power and electrical equipment.

It was clearly not a purely private enterprise by Snider alone, but an arrangement for the mutual business advantage of both parties. Snider thereby acquired connection between his

coal station and a railway over which he could receive his coal supplies for his trade, and the railway company thereby secured the handling of such shipments, and the earnings to be derived from freights and switching charges. To all intents and purposes, the construction, maintenance, and operation of the spur constituted a joint enterprise, to which each contributed substantially one half the cost, in consideration of the advantages to arise therefrom to the individual benefit of each.

The case thus presented is quite similar in principle to that of *Schoen v. Chicago, St. P., M. & O. R. Co.*, 112 Minn. 38. There, the railway and a brewing company had an arrangement by which the railway furnished the brewing company the use of materials for tracks or switches laid in the yards of the latter, and also leased it a locomotive for use on such tracks. The ties and rails in the yard were owned by the railway, and the real estate by the brewery. This was held to be "a joint enterprise of the two companies directly connected with their respective activities," and that the "maintenance of such yard is the operation of a railroad." In discussing the case, the court makes use of this language, which is very pertinent to the situation with which we here have to deal:

"The most that can be claimed from the arrangement is that it was a joint enterprise over which each defendant exerted some, but not exclusive, control, and therefore either or both may be liable."

Can there be any doubt of what is meant by "operating" a railway? Does the phrase not at once convey to every intelligent and impartial mind the idea of putting the railway to actual use in the business or employment for which it has been constructed? *Connors v. Chicago & N. W. R. Co.*, 111 Iowa 384, 386.

It is applicable to the use of privately owned railroads, as well as to those open to public use. *Woodward Iron Co. v. Lewis*, 171 Ala. 233; *Glines. v. Oliver Iron Min. Co.*, 108 Minn. 278; *Coughlan v. City of Cambridge*, 166 Mass. 268; *Liles v. Fosburg Lbr. Co.*, 142 N. C. 39; *Hampton v. Woolsey*, (Tex.) 139 S. W. 888.

But, says the appellant, "to operate" means right, power, and authority to manage and control; and it claims that, under

the terms of the contract with Snider, he is the absolute owner
of the track south of the north line of the avenue, and the de-
fendant could not go upon Snider's track to repair or improve
the switch without Snider's consent, for otherwise it would be
guilty of trespassing. We do not so read or construe the con-
tract. The defendant there undertook to comply with Snider's
request to furnish railroad facilities to his premises, and to that
end agreed to construct and operate a track from the initial point
"to the coal depot of said Snider," and the terms on which this
work was to be done and this service performed are specifically
provided. By that contract, the defendant bound itself to con-
struct and operate the track. The construction and operation
of a railway track are the construction and operation of a rail-
way, and the statute makes it the duty of a company construct-
ing or operating a railway to keep and maintain its public cross-
ings in safe condition. It follows, of necessity, that, when de-
fendant undertook such construction and operation, it also took
upon itself the statutory duty imposed on all companies operat-
ing railways. It also follows that, when Snider entered into
such contract with defendant, he consented to the performance
of that duty by defendant; and nothing which defendant could
reasonably do to make or keep the crossing reasonably safe would
be a trespass on any of Snider's rights. It is also to be remem-
bered that the alleged defect in the track is in the public street,
and not on Snider's private domain.

It is argued on behalf of appellant that to sustain this
verdict and judgment is to charge appellant with responsibility
for the negligence of another. Such is neither the substance
nor effect of the judgment appealed from. The negligence
charged is the negligence of the appellant; the duty alleged to
have been violated was its duty; and the only question upon the
merits of the case is whether the evidence is sufficient to sustain
the finding of the jury on this question.

II. We shall not attempt any extended statement of the
testimony of the witnesses. There is much conflict in some of
its phases, but there is sufficient, if believed by the jury, to

2. NEGLIGENCE:        justify a finding that the sidewalk in question
contributory          was laid before the spur track was constructed;
negligence:
excusing factors.     that, in constructing the spur, the space be-

tween the rails where it crossed the walk was left unfilled; that the earth or soil in said space wore away, or washed out, leaving a depression of several inches in depth, and uneven surface, while the walk on the outside of the rails remained at substantially the height of the top of the track; that plaintiff had never before used the walk at this place; that, on the day in question, she was on her way to take a street car at the next street crossing, and, as she neared the spur track, the approach of the street car attracted her attention, and caused her to increase her pace, when unexpectedly she stepped into the depression between the rails, causing her to stumble, catch her foot against the east rail, and fall forward, receiving the injury of which she complains.

It is contended for appellant that plaintiff was herself negligent; that if the defect existed, as claimed, she ought to have seen and avoided it. We are of the opinion that the question of her due care is not one to be disposed of as a matter of law. The fact that she had never before been over this part of the walk, and had no previous notice of the alleged defect, and that her attention was, to some extent, distracted by the approach of the car she expected to board, are circumstances fairly to be considered in her favor. While the pedestrian is expected to keep reasonable lookout to know the condition of the sidewalk which he uses, he is not required to keep it constantly in view nor bound to discover every defect, even though it be visible. He may, without negligence, place some degree of reliance upon having the way left open to his use, and in which he is impliedly invited to travel, kept in reasonably safe condition for that purpose; and if, when his attention is momentarily diverted, such defect in the walk causes him to stumble and fall and receive injury, he is not chargeable with negligence, as a matter of law.

If the jury believed the witnesses for plaintiff, it could well find that the condition of the crossing of the sidewalk at this point constituted a defect and source of danger to pedestrians, a defect which reasonable care on part of those charged with the maintenance of the crossing could readily have remedied.

If, then, the jury found, as its verdict indicates, that the defendant was reasonably chargeable with the duty of constructing and maintaining this crossing in reasonably safe condition

for public use; that it neglected this duty and permitted such crossing to be and remain in an unsafe condition; that, by reason thereof, plaintiff was caused to fall and receive injury, without contributory negligence on her part, it cannot be said that its findings are without support in the record, and the trial court did not err in refusing to direct a verdict for the defendant.

III.  Defendant offered evidence tending to show that the stumble which preceded the plaintiff's fall did not occur on the crossing, but at a point 15 feet or more west of the crossing, where there is what is spoken of as a "drop" of about three inches in the level of the walk. Some of the witnesses testify that, as plaintiff was moving hurriedly eastward, she stumbled at this point, and continued in a half-falling forward movement, until she fell to the ground or walk at the crossing.  With reference to this phase of the case, the defendant asked the court to charge the jury that, if the testimony shows that plaintiff, running eastward over the drop in the walk, "lost her balance and fell, then the condition of the Snider switch was not the proximate cause of her fall, and if you so find, you should return a verdict for the defendant.  *   *   *  If the plaintiff's fall was the result of her stepping off the drop in the sidewalk, without being conscious of the drop at the time she did fall, and she lost her balance by reason of that fact, and fell between the rails of the Snider switch, then and in that event the condition of the switch would not be the proximate cause, but the drop in the sidewalk would be the proximate cause; and if you so find, your verdict should be for the defendant."

3. TRIAL: instructions: ambiguous modification.

The court gave this instruction substantially as requested, modified only by first inserting therein, immediately after the part first above quoted, the words, "and if you find by a preponderance of the evidence that the Snider switch was not the proximate cause of her fall."  Error is assigned on the giving of the modified instruction.  As is not unusual when a court attempts to modify and give a requested instruction, this one is not happily framed.  Indeed, it is not easy of construction or interpretation.  In its original form, it seems, briefly stated, to say to the jury that, if the drop in the walk 15 feet west of the switch was the proximate cause of the plaintiff's fall, then the

condition of the switch itself was not the proximate cause of her
fall,—a proposition not of law so much as an axiomatic state-
ment of fact, the truth of which must have been as evident to the
mind of an intelligent juror without instruction by the court
as with it. The modification added by the court seems to indi-
cate the thought in its mind that, even if plaintiff began to
stumble at the drop west of the switch, yet there was room for
the jury to find that her stumbling progress to the east of the
drop would not have ended in her fall, had she not stepped into
the space between the rails and tripped, as she claims she did;
and the court sought in this manner to prevent confusion over
this feature of the case. Whatever be the true theory in this
respect, the court did conclude the instruction by telling the
jury, as requested, that, if plaintiff's fall was the result of her
stepping off the drop in the walk, whereby she lost her balance
and fell between the rails of the switch, then the condition of the
switch was not the proximate cause of her fall, but the drop in
the walk would be the proximate cause, and in such event the
verdict should be for the defendant. Taking the instruction as
a whole, it could not have been prejudicial to the defendant.

IV. Complaint is made that the court misdirected the jury
as to the duty of the defendant in constructing and maintaining
the crossing over the sidewalk. The court charged that it was

**4. RAILROADS:
negligence:
tracks across
sidewalks.**

the duty of the defendant to use ordinary care,
skill, and foresight in the construction and
maintenance thereof, to protect the traveling
public in the use of the sidewalk, and that, to the end that such
public rights might not be unreasonably impaired or infringed
upon, it was the duty of the defendant "to so lay the rails of
the spur as that the tops thereof would be substantially level
with the surface of the sidewalk, and to fill in the space between
the rails of the spur or switch track substantially as wide as the
sidewalk and level with the tops thereof." Error is assigned
upon this instruction, that it requires too high degree of care
upon part of defendant, and invades the province of the jury.
It is said that the statutory requirement is only that the cross-
ings be "good, sufficient, safe;" and that what amounts to a
crossing of that kind should be left to the jury.

The instruction criticized is, in substance, quite identical

with one approved by this court in *Citizens R. & L. Co. v. Fore-paugh,* 149 Iowa 355. The cited case was not dealing with a railway crossing, but, in essential respects, is quite analogous in principle, and had in consideration the duty of a street railway company to use care in laying its track to avoid material impairment of the free use of the street by the traveling public.

This instruction, as applied to the case now before us, when fairly considered, does no more than to say that, to meet the requirements of the law for a ''good, safe, and sufficient crossing,'' it should be so constructed as to bring the surface which is disturbed or broken by the construction of the track approximately up to the general level or grade of the walk at that point, thus avoiding, so far as practicable, the existence of any obstruction or irregularity in the surface of the crossing over which pedestrians would be likely to stumble or fall. · Even in the absence of a statute, it might well be held that it is the duty of a railway company laying its track across a street or sidewalk to so construct and maintain its tracks with reference to the rights of the public as not to unnecessarily endanger persons lawfully on the street or walk so occupied.

In *Memphis G. & P. R. Co. v. State,* 87 Tenn. 746, the court says that it is the common-law duty of a railway in a public street ''to keep the space of the highway occupied by its roadbed * * * properly graded and in good repair, so as not to be any obstruction to travel across the roadbed or longitudinally upon it, and also to keep the crossings, where its roadbed is traversed by streets, in good repair.''

Referring to the form of instruction given in the *Fore-paugh* case, we there said:

''As directed to this inquiry,—that is, whether the roadbed was in the condition plaintiff was required to construct and maintain it,—the matters enumerated in the tenth instruction were pertinent, and for the consideration of the jury.''

It is equally clear that the same matters were likewise pertinent for the jury to have in mind in considering the condition of this particular crossing, and determining whether the defendant's duty with reference thereto had been properly observed. The exception taken to this instruction cannot be sustained.

In so far as other errors have been assigned, but not argued, we do not consider them. Others are clearly governed by our conclusions already announced; and the others, of which no special mention has been made, we have examined, and find nothing involving material error.

There is nothing in the record to justify a reversal or retrial, and the judgment appealed from is—*Affirmed.*

EVANS, C. J., PRESTON and DE GRAFF, JJ., concur.