## UNITED STATES v. FORT WORTH & DENVER CITY RY. CO.

### No. 848.

District Court, N. D. Texas, Amarillo Division.

July 14, 1937.

Clyde O. Eastus, U. S. Atty., and Frank B. Potter, Asst. U. S. Atty., of Fort Worth, Tex., and M. C. List, Atty. for the Interstate Commerce Commission, Bureau of Safety, of Washington, D. C., for the United States.

Thompson & Barwise, of Fort Worth, Tex., and Morgan, Culton, Morgan & Britain, of Amarillo, Tex., for defendant.

JAMES C. WILSON, District Judge.

This is an action to recover a penalty brought under the Safety Appliance Act in which the government alleged that the defendant, which was engaged in interstate commerce, operated over its railroad, a highway of interstate commerce, a locomotive engine designated as a Browning steam locomotive crane, which was not equipped with a power driving wheel brake.

The parties waived a jury, and agreed that the cause be submitted to the court upon an agreed statement of facts. From the agreed statement it appears that the defendant operated a line of railroad extending from Pampa, Tex., to Childress, Tex., and that in operating this line it was engaged in interstate commerce. On the date the alleged violation of the Safety Appliance Act occurred the defendant was engaged in construction work upon this line of railroad at a point three-fourths of a mile north of Meldavis on such line and at another point

about two and one-half miles from Meldavis. In conveying the materials needed in this construction work from the switch at Meldavis to the construction work a locomotive crane had attached to it a car used for carrying fuel and water needed in the operation of the crane and two flat cars loaded with heavy boulders, which it moved from the switch at Meldavis to the construction work. The crane would then unload the heavy boulders from the flat cars at the point where they were needed in the construction work, return the flat cars to the switch at Meldavis, pick up other cars loaded with boulders, and move them to the construction work.

The locomotive crane consisted of the arm of the crane, cables, and pulleys and a cab which contained the steam engine and appliances for controlling the equipment, all mounted on a short flat car at the ends of which were couplers. It was propelled by power furnished by the steam engine, and was not equipped with a power driving wheel brake.

The defendant is charged with violating section 1 of the Safety Appliance Act; section 1 of title 45 of the U.S.Code, 45 U.S.C.A. § 1, which reads: "Section 1. *Driving-wheel brakes and appliances for operating train-brake system.* It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose." As amended by section 8 of title 45 of the U.S. Code, 45 U.S.C.A. § 8, which reads: "§ 8. *Provisions of chapter extended.* * * * And the provisions and requirements relating to train brakes, automatic couplers, grab irons, and the height of drawbars shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce."

The defendant contends that under the facts it is not guilty of violating the provisions of the Safety Appliance Act because the locomotive crane is not a locomotive within the meaning of the act; because section 8 of title 45 of the U.S.Code, 45 U.S.C. A. § 8, does not by the use of the term "train

brakes" include "power driving wheel brakes," so that the Safety Appliance Act does not require that a locomotive not used in "moving interstate traffic" be equipped with power driving wheel brakes, and the equipment in question here was not used in "moving interstate traffic"; because the operations in question were not train movements, and therefore the provisions of the Safety Appliance Act relating to power driving wheel brakes do not apply.

I believe these are the only questions presented by this record, and, if the defendant is correct in any one of them, it should have judgment in its favor.

In speaking of the Safety Appliance Act, the United States Supreme Court in New York Central Railroad Company v. United States, 265 U.S. 41, 44 S.Ct. 436, 437, 68 L. Ed. 892, speaking through Justice Butler, said: "The acts of Congress and orders of the Commission above referred to should be liberally construed, to relieve trainmen of the labor and danger involved in the use of hand brakes to control the speed of trains, and to promote the safety of trains and of persons and property thereon."

Jarvis v. Hitch, 161 Ind. 217, 67 N.E. 1057, 1060, and Lake Shore & M. S. R. Co. v. Benson, 85 Ohio St. 215, 97 N.E. 417, 419, 41 L.R.A.,N.S., 49, Ann.Cas.1913A, 945, cited by both sides, are not in point, but the cases do furnish a definition of "locomotive" which I think is correct.

In Jarvis v. Hitch, supra, the Supreme Court of Indiana, in determining whether a pile driver mounted upon a flat car, which was self-propelling, was a locomotive under the statutes of Indiana, said: "By the term 'locomotive engine' used in said clause, the Legislature only intended an engine constructed and used for traction purposes on a railroad track." The court based this definition upon an English case, Murphy v. Wilson, 48 Law Times, N.S., 788, 52 Law Journal Q. B. D. 524, 525, from which the court quoted, saying: "the alleged 'locomotive engine' was a 'machine consisting of a crane and a steam engine working it, both being mounted on the same truck and forming one machine, and so constructed that the engine served the double purpose of moving the machine from place to place and of raising stone by means of the crane.' * * * 'This machine was a steam crane, so fixed on a trolley that, by means of shifting gear working on the axles of the trolley, the crane and trolley could be moved from one place to another along rails which in the

present case were only temporary. * * * Now the term "locomotive engine" has a well-known significance, and is used generally for an engine to draw a train of trucks or cars along a permanent or temporary set of rails. * * * The machine in this case is intended to lift heavy weights of stone and other materials used in constructing a railway, having, besides, an incidental power of applying its steam force to the trolley'" and it was therefore held not to be a locomotive.

In Lake Shore & M. S. R. Co. v. Benson, supra, the question before the court was whether a locomotive crane was a "locomotive, car, tender, or similar vehicle used in moving state traffic" by a common carrier. The court said: "after the railway company, as a common carrier, had performed all its duties as such by delivering the loaded cars upon the temporary tracks constructed on the partly built dock, that in furtherance of the construction of the dock this derrick, or crane, was used as the power for shifting these cars to the desired position on the track for unloading, or for moving cars, so that they would not interfere with the unloading of other cars"; and "after the railroad company had deposited these loaded cars upon the partly built dock, its duties as a common carrier were ended and from that time forward whatever was done in and about the construction of the dock was a totally different enterprise, just as much as if an entirely different company, or contractor, was engaged in this construction, and after these cars had been delivered by the railway company would then take charge of these materials and apply them to their use in the building of this dock. If a private individual had been engaged in this work, this machine would have been just as necessary to his use in this construction as it was to the company's use, and yet under such circumstances it would hardly be claimed that these sections apply." From this it appears that the court based its decision upon the fact that the equipment was not being used by a common carrier as such, rather than upon whether it was a locomotive. The court continued: "If this machine, regardless of the name by which it was known or designated, had been used by the railway company on the line of its road, either for the purpose of a locomotive, or for any other purpose in furtherance of, and as a part of its railway business, then the character of the tracks and nature or ownership of the material with which the cars were loaded

would be of little importance, for by such use this machine would come not only within the meaning, but the terms of these statutes requiring automatic couplers and requiring drawbars of standard height."

The defendant here was using the locomotive crane to convey materials loaded on cars from the switch at Meldavis, over its line of railroad, a distance up to two and one-half miles, to the scene of the construction work, and in doing so was using it "for traction purposes on a railroad track." I do not think that the mere fact that the locomotive crane is self-propelling makes it a locomotive. In other words, while the equipment is being used as a crane, and moved about at the scene of construction, it is still a crane and does not become a locomotive, but where, as here, it is used to haul cars for a distance up to two and one-half miles from a switch to the scene of construction, it is being used for the purposes for which a locomotive is used and is a locomotive within the meaning of the statute. While the equipment is being used as a locomotive, it is a locomotive, regardless of whatever else it might also be.

In Hoffman v. New York, N. H. & H. R. Co., 2 Cir., 74 F.2d 227, 232, the court said: "It is argued that the gasoline tractor was not a 'locomotive,' and therefore that it did not have to have a 'power driving wheel brake,' and that an automatic coupler on a hand car is fantastic and unheard of. But the gasoline engine was frequently used to haul a long line of cars, and there was as much reason for its being equipped to control their movements, as though it had been a steam locomotive employed for a similar purpose. The words of the act 'similar vehicles' have already been construed as including an electric engine, and we cannot see how a gasoline tractor employed in interstate commerce differs. Spokane & Inland Empire R. R. Co. v. Campbell, 241 U. S. 497, 36 S.Ct. 683, 60 L.Ed. 1125."

The distinction between a train movement and a switching operation is stated in United States v. Erie Railroad Co., 237 U. S. 402, 35 S.Ct. 621, 624, 59 L.Ed. 1019: "A train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing

trains, and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air-brake provisions." In speaking of "air-brake provisions," the court was referring to air brakes on cars. I do not believe it was referring to air brakes on locomotives, because the air brake provisions as relating to trains were the only air brake provisions before the court.

In conveying the construction materials to the scene of construction the defendant was acting as a carrier rather than as construction contractor, and the operations here were "train movements" within the above definition.

In discussing section 8, title 45 of the U. S.Code, 45 U.S.C.A. § 8, in Southern Railway Company v. United States, 222 U.S. 20, 32 S.Ct. 2, 4, 56 L.Ed. 72, the Supreme Court speaks of "the manifest purpose, shown throughout the amendatory act, to enlarge the scope of the earlier one and to make it more effective," and says: "For these reasons it must be held that the original act, as enlarged by the amendatory one, is intended to embrace all locomotives, cars, and similar vehicles used on any railroad which is a highway of interstate commerce."

██ The Safety Appliance Act does not disclose that it was the intention of Congress to confine the term "train brakes" to any narrow or technical meaning. In section 1 of title 45 U.S.Code, 45 U.S.C.A. § 1, the phrase "train-brake system" appears and also the phrase "power or train brakes," and in section 9, tit. 45 U.S.Code, 45 U.S.C.A. § 9, the phrase "power-braked cars" appears and also the phrase "power or train brakes." In section 8 "train brakes" appears. I believe that all of these phrases refer to the same kind of brakes, that is, power brakes, and that the phrase "train brakes" appearing in section 8 includes power driving wheel brakes.

The locomotive crane is a "locomotive engine" required by the act to be equipped with power driving wheel brakes when being used as it was on this occasion.

This conclusion is supported by the case of Hoffman v. New York, N. H. & H. R. Co., supra, which was a suit to recover damages for personal injuries received through the operation by the defendant of a gasoline tractor in moving a hand car from one point in a railroad yard to another. This movement was certainly not one in which the tractor was used in moving interstate traffic, and, moreover, was clearly a switching operation. The court said: "The defendant further argues that sections 6 of the act of 1893 and 2 of the act of 1903 (45 U. S.C.A. §§ 6, and 9) indicate that the provisions requiring power brakes and automatic couplers are limited to train movements and do not embrace locomotives and cars in yards employed in switching operations. But this is clearly erroneous. The exceptions in section 6 are expressly limited to 'logging' trains. The provisions of section 9 relating to trains do not, in our opinion, affect the requirement in the act of 1903, amending the Safety Appliance Act (45 U. S.C.A. § 8), of brakes, couplers, and grab irons on 'all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce.' By it the engine was required to have a power brake and the hand car an automatic coupler."

For the above reasons, judgment will be for the plaintiff.